73 Cal.Rptr.3d 911 (2008)
161 Cal.App.4th 388
Lawrence O'BRIEN, etc.; Plaintiff and Appellant,
v.
CAMISASCA AUTOMOTIVE MAUFACTURING, INC., etc., et al., Defendants and Respondents.
No. B195641.
Court of Appeal of California, Second District, Division Three.
March 27, 2008.
*914 The Rossbacher Firm, Henry H. Rossbacher, James S. Cahill and Talin Khachaturian Tenley, Los Angeles, for Plaintiff and Appellant.
Law Offices of Barry P. King and Barry P. King, Los Angeles; Jones, Bell, Abbott, Fleming & Fitzgerald L.L.P. and Fredrick A. Rafeedie, Los Angeles, for Camisasca Automotive Manufacturing, Inc., Defendant and Respondent.
Jeffer, Mangels, Butler & Marmaro LLP, Stanley M. Gibson and Matthew D. Hinks, Los Angeles, for Volkswagen of America, Inc., Defendant and Respondent.
ALDRICH, J.

INTRODUCTION
Plaintiff Lawrence O'Brien brought this putative class action lawsuit against defendants Camisasca Automotive Manufacturing, Inc. and Volkswagen of America, Inc. (Volkswagen), alleging defendants violated the Unfair Competition Law (Bus. & Prof. *915 Code [1] (the UCL)), the False Advertising Law (the FAL),[2] and the Consumers Legal Remedies Act (the CLRA)[3] by falsely representing that the license plate frames defendants offered for sale were "Made in USA." The trial court granted defendants' motions for summary judgment on the ground that O'Brien did not have standing under Proposition 64's amendments to the UCL and the FAL. The amendments authorize a lawsuit under those statutes only by a person "who has suffered injury in fact and has lost money or property as a result of a violation of these acts.
The undisputed facts are that O'Brien did not see any country of origin representation with respect to the license plate frame before he purchased it, with the result any "injury in fact" O'Brien may have suffered was not "as a result of" an unfair business practice or false advertising. Accordingly, we hold, as a matter of law, that O'Brien has no standing. We also hold that the trial court did not abuse its discretion, after ruling on the summary judgment motions, in denying plaintiffs leave to amend the complaint to name a plaintiff with standing. Plaintiffs failed to justify the long delay before suggesting they could amend, and have yet to move to amend or to submit an amended complaint showing how they could cure the standing deficiency. Accordingly, we affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

1. O'Brien purchases a license plate frame and agrees to be lead plaintiff in the class action lawsuit.

Camisasca is the sole authorized manufacturer of "genuine" Audi license plate frames authorized by Volkswagen. These license plate frames are available for purchase through Camisasca's catalogue and internet site. In addition to various types of Audi license plate frames, the catalogue advertised clothing, key fobs, and wheel frames, among other things. As a recent lessee of an Audi automobile, O'Brien received an accessories catalogue of Audi products in the mail.
In perusing the catalogue, O'Brien did not "directly" see a "Made in USA" representation associated with the license plate frame he bought. There was nothing on the catalogue page depicting the license plate frames to indicate that the frame was either "Made in USA" or not "Made in USA." O'Brien stated, "[i]n going through the catalog, looking at various items, it was clear that some items were imported in the description. It would say `imported.' Those items thatand other items didn't have that designation. So I assumed that's made in the U.S. [¶] The license plate description did not have an imported designation in the description field, so I took that as being made in the U.S.A." (Italics added.) O'Brien testified that "looking at the catalog, it was apparent that it was not imported, made in the U.S.A., and considering the price, I figured it was going to be a sturdy plate."
Nor did O'Brien see a "Made in USA" representation on the website, audiusa.com, from which he ordered the license plate frame. Other than to look at the catalogue and the website, O'Brien conducted no research into the frame he chose before he purchased it.
O'Brien purchased an Audi license plate frame from Camisasca. O'Brien acknowledged *916 in his deposition that he saw no "Made in U.S.A." designation in relation to the license plate frame before his purchase: "Q. And then [in] purchasing that frame, am I correct that you had not seen the words, `Made in the U.S.A.' in relation to that frame anywhere? [¶] A. Correct."
After purchasing the license plate frame, but before receiving it in the mail, O'Brien met with Henry Rossbacher, his attorney in this case. Rossbacher came to O'Brien to tell him about a new case "regarding license plates and not being manufactured in the U.S. when they said they were." O'Brien agreed to become a plaintiff in the lawsuit weeks before he received the license plate frame at issue.
The first time O'Brien saw the words "Made in U.S.A." was weeks after purchasing the frame when he received it in the mail. The designation was stamped on the back of the packaging containing the frame. Rather than to put the license plate frame on his car, O'Brien took it to his attorney.[4] O'Brien never sought a refund from Audi because, he explained, "at this point I had agreed to be a plaintiff in the case...."

2. The class action commences.[5]
On January 21, 2005, O'Brien sent a certified letter to Camisasca notifying it of alleged acts or practices declared to be unlawful by the CLRA by "Using deceptive representations or designations of geographic origin in connection with goods or services.... Advertising goods or services with intent not to sell them as advertised." (Civ.Code, § 1770, subd. (a)(4) & (9).)
Eighteen days later, on February 8, 2005, three months after Proposition 64 was approved by the voters of California, O'Brien filed this class action on behalf of all residents of the United States who purchased Volkswagen and Audi license plate frames from catalogues, internet, and automobile dealerships. O'Brien alleged that he purchased a license plate frame that Camisasca and Volkswagen misrepresented as "Made in USA." He alleged specifically that Camisasca represented that the license plate frames sold by Volkswagen, through Audi, are "Made in USA" and "Fabrique aux Etats-Unis" where such frames and parts are entirely or substantially made or produced outside of the United States of foreign steel and materials that are then imported into the United States. These misrepresentations, he alleged, "fraudulently induced" him "to purchase the License Plate Frames at premium prices; prices higher than products not falsely claimed to be `Made in USA.'" (Italics added.) The complaint alleged that defendants' false advertisements and misrepresentations constituted deceptive and untruthful advertising and marketing that induced thousands of consumers to purchase the license plate frames based on the expectation that the frames were made in the United States. He alleged that these misrepresentations of national origin violated the UCL, section 17533.7 of the FAL, and the prohibition in CLRA Civil Code section 1770, subdivision (a) against using deceptive representations of geographic origin in misdescribing products.

*917 3. Defendants move to strike the CLRA damages allegation.

Defendants demurred to the complaint on the ground that, pursuant to Proposition 64, O'Brien lacked standing and the legal capacity to state a cause of action under the UCL and the FAL. Defendants also moved to strike the CLRA damages allegation in the complaint because O'Brien failed to comply with the requirements of Civil Code section 1782, subdivision (a) by failing to notify Camisasca of its alleged CLRA violations 30 days or more before the commencement of the action. The trial court struck the damages allegation from O'Brien's CLRA claim.
At the request of the trial court to resolve the standing issue at one time rather than seriatim, defendants opted to challenge O'Brien's standing by way of summary judgment.
At the initial status conference in April 2005, five months after Proposition 64 became effective, the trial court ordered the deposition of O'Brien to go forward and ordered O'Brien to draft proposed discovery focused on the standing issue.

4. Defendants move for summary judgment on the issue of standing.

Defendants then moved for summary judgment on the sole ground that there was no triable issue of fact that O'Brien did not rely on the alleged misrepresentations when purchasing the license plate frame, and so as a matter law, O'Brien lacked standing to pursue the action under the FAL, the UCL, and the CLRA.
The facts underlying the motions were derived solely from O'Brien's complaint and deposition, with the result defendants noted, they were undisputed. Defendants asserted that O'Brien testified in his deposition that he suffered no injury arising from any "Made in U.S.A." representation because he did not see the allegedly false representation that he claimed "induced" him to purchase the license plate frame. O'Brien did not actually see a country-of-origin designation until several weeks after he made the purchase when he received the product through the mail. Furthermore, Camisasca asserted, by the time O'Brien received the license plate frame, he had already agreed to become the plaintiff in this action.
The trial court granted the summary judgment motions and issued a 15-page ruling on August 7, 2006. After the trial court granted the motion but before it entered judgment, O'Brien sought a status conference for the purpose of "discuss[ing] a timetable for amendment of the complaint." (Italics added.) Finding no actual motion before it other than defendants' proposed judgment, the trial court entered judgment effectively foreclosing plaintiffs from amending their complaint to name a plaintiff with standing. O'Brien filed his timely appeal.

CONTENTIONS
O'Brien contends that the trial court erred in (1) finding O'Brien did not have standing to pursue his claims under the FAL and the UCL; (2) striking O'Brien's damages allegation from his CLRA cause of action; and (3) denying plaintiffs the opportunity to amend the complaint to cure the standing problem.

DISCUSSION

1. Standard of review

Summary judgment is granted when a moving party establishes the right to entry *918 of judgment as a matter of law. (Code Civ. Proa, § 437c, subd. (c).)
As moving party, a "defendant or cross-defendant has met his or her burden of showing that a cause of action has no merit if that party has shown that one or more elements of the cause of action, even if not separately pleaded, cannot be established, or that there is a complete defense to that cause of action." (Code Civ. Proa, § 437c, subd. (p)(2); see also, Aguilar v. Atlantic Richfield Co. (2001) 25 Cal.4th 826, 853, 107 Cal.Rptr.2d 841, 24 P.3d 493.) Once the moving defendant meets its burden, the burden shifts to the plaintiff to show a triable issue of material fact exists as to that cause of action or defense. (Code Civ. Proa, § 437c, subd. (p)(2).) To meet the responsive burden, the plaintiff must set forth the specific facts "show[ing] that a triable issue of one or more material facts exists as to that cause of action or a defense thereto." (Ibid.) "Where the plaintiff fails to satisfy this burden, judgment in favor of the defendant shall be granted as a matter of law. [Citation.]" (Lopez v. Baca (2002) 98 Cal.App.4th 1008, 1014, 120 Cal.Rptr.2d 281.)
On appeal, we make "an independent assessment of the correctness of the trial court's ruling, applying the same legal standard as the trial court in determining whether there are any genuine issues of material fact or whether the moving party is entitled to judgment as a matter of law. [Citations.]" (Iverson v. Muroc Unified School Dist. (1995) 32 Cal.App.4th 218, 222-223, 38 Cal.Rptr.2d 35.) We "review the record de novo, considering all the evidence set forth in the moving and opposition papers except that to which objections have been made and sustained. [Citation.]" (Guz v. Bechtel National Inc. (2000) 24 Cal.4th 317, 334, 100 Cal.Rptr.2d 352, 8 P.3d 1089.)

2. The FAL and UCL

a. Based on the language of Proposition 64, a plaintiff must have relied on the false advertising or unfair business practices to have standing under the FAL and the UCL.

The FAL prohibits consumer deception. Section 17533.7 makes it unlawful for anyone to sell or offer for sale merchandise on which there appears the words "Made in U.S.A." or similar words, when the merchandise or any part thereof, has been entirely or substantially made elsewhere.[6] (See Kasky v. Nike, Inc. (2002) 27 Cal.4th 939, 950, 119 Cal.Rptr.2d 296, 45 P.3d 243.) Any violation of the FAL necessarily violates the UCL. (Id. at p. 950, 119 Cal.Rptr.2d 296, 45 P.3d 243; Committee on Children's Television, Inc. v. General Foods Corp. (1983) 35 Cal.3d 197, 210, 197 Cal.Rptr. 783, 673 P.2d 660.)
The UCL was enacted to protect consumers and competitors from unlawful, unfair, or fraudulent business acts or practices. The UCL accomplished this goal by promoting fair competition in commercial markets for goods and services. (Kasky v. Nike, Inc., supra, 27 Cal.4th at p. 949, 119 Cal.Rptr.2d 296, 45 P.3d 243.)
Over time, the UCL had become the subject of abuse or "a kind of legal shakedown *919 scheme: Attorneys form[ed] a front `watchdog' or `consumer' organization. They scour[ed] public records on the Internet for what [were] often ridiculously minor violations of some regulation or law by a small business, and sue[d] that business in the name of the front organization." (People ex rel. Lockyer v. Brar (2004) 115 Cal.App.4th 1315, 1317, 9 Cal. Rptr.3d 844.)
In response, the voters approved initiative measure Proposition 64 in the November 2, 2004, general election. "[A]s stated in the measure's preamble, the voters found and declared that the UCL's broad grant of standing had encouraged `[f]rivolous unfair competition lawsuits [that] clog our courts[,] cost taxpayers' and `threaten ] the survival of small businesses....' [Citation.] The former law, the voters determined, had been `misused by some private attorneys who' `[f]ile frivolous lawsuits as a means of generating attorney's fees without creating a corresponding public benefit,' `[f]ile lawsuits where no client has been injured in fact,' `[f]ile lawsuits for clients who have not used the defendant's product or service, viewed the defendant's advertising, or had any other business dealing with the defendant,' and `[f]ile lawsuits on behalf of the general public without any accountability to the public and without adequate court supervision.' [Citation.] `[T]he intent of California voters in enacting' Proposition 64 was to limit such abuses by `prohibit[ing] private attorneys from filing lawsuits for unfair competition where they have no client who has been injured in fact' [citation] and by providing `that only the California Attorney General and local public officials be authorized to file and prosecute actions on behalf of the general public' [Citation.]" (Californians For Disability Rights v. Mervyn's, LLC (2006) 39 Cal.4th 223, 228, 46 Cal.Rptr.3d 57, 138 P.3d 207.)
To accomplish its goals, Proposition 64 amended section 17204 concerning standing. The UCL now authorizes lawsuits only by a person "`who has suffered injury in fact and has lost money or property as a result of unfair competition.'" (Californians For Disability Rights v. Mervyn's, LLC, supra, 39 Cal.4th at p. 228, 46 Cal. Rptr.3d 57, 138 P.3d 207, italics added; see also § 17203.)[7]
The standing requirements of the FAL were identically amended by Proposition 64. (Californians For Disability Rights v. Mervyn's, LLC, supra, 39 Cal.4th at p. 229, fn. 2, 46 Cal.Rptr.3d 57, 138 P.3d 207, citing §§ 17535 & 17536, subd. (c), as amended by Prop. 64, §§ 5, 6.) A plaintiff with standing under the FAL is "any person who has suffered injury in fact and has lost money or property as a result of a violation of this chapter."[8] (§ 17535, as amended by Prop. 64, § 5, italics added.)
Published cases interpreting Proposition 64 have held, either explicitly *920 or implicitly, that to have the requisite standing under the UCL and the FAL, the plaintiff must have spent money, lost money or property, or been denied money to which he or she was entitled, due to unfair business practices or false advertising. (§§ 17204 & 17535; Hall v. Time, Inc. (2008) 158 Cal.App.4th 847, 855, 70 Cal. Rptr.3d 466 [no standing where, even if plaintiff suffered injury in fact, plaintiff made no causation showing]; Overstock.com, Inc. v. Gradient Analytics, Inc. (2007) 151 Cal.App.4th 688, 716, 61 Cal. Rptr.3d 29 [standing found where plaintiff pled unlawful action resulted in diminution in assets' value]; Arm v. U-Haul Co. of California (2006) 143 Cal.App.4th 796, 802-803, 49 Cal.Rptr.3d 555 [standing found where plaintiff alleged he suffered economic loss as the result of defendants' requirement he purchase excess fuel where there was no accurate measuring device to determine the actual amount required to return the truck at its rental fuel level]; Huntingdon Life Sciences, Inc. v. Stop Huntingdon Animal Cruelty USA Inc. (2005) 129 Cal.App.4th 1228, 1262, 29 Cal.Rptr.3d 521 [standing found where plaintiff suffered damage to her property as the result of animal activists' conduct in violation of UCL]; see also Laster v. Mobile USA Inc. (S.D.Cal.2005) 407 F.Supp.2d 1181, 1194 [no standing where plaintiffs did not allege they relied on allegedly false or misleading advertising]; Southern Cal. Housing v. Los Feliz Towers Homeow. (C.D.Cal.2005) 426 F.Supp.2d 1061, 1069 [standing found where plaintiff alleged it lost financial resources and diversion of staff from other cases to investigate claim]; see R & B Auto Center, Inc. v. Farmers Group, Inc. (2006) 140 Cal. App.4th 327, 359-360, 44 Cal.Rptr.3d 426 [standing found where plaintiff alleged it paid premiums and losses because of misrepresentations].) Based on these cases, after Proposition 64, a plaintiff seeking to bring a representative lawsuit under the UCL and the FAL must show that (1) he or she has suffered actual injury in fact, and (2) such injury occurred as a result of the defendant's alleged unfair competition or false advertising. (Laster v. T-Mobile USA, Inc., supra.) "The phrase `as a result of in its plain and ordinary sense means `caused by' and requires a showing of a causal connection or reliance on the alleged misrepresentation." (Hall v. Time, Inc., supra, at p. 855, 70 Cal.Rptr.3d 466.)
O'Brien contends that "reliance is not an element of claims brought under sections 17200 or 17500." We are concerned here with whether "reliance" is an element of standing under Proposition 64.[9] For a private party to have standing under sections 17204 and 17535, Proposition 64 dictates that the plaintiff have "suffered injury in fact ... as a result of" an unfair business practice or false advertising. (Italics added.) Parsing this language, it *921 unavoidably implicates causation, that is to say, the unfair business practices or false advertisement must have caused injury in fact to the plaintiff. For a plaintiff to suffer "injury in fact ... as a result of the alleged unfair business practice or false advertising (§§ 17204 & 17535, italics added), necessarily the plaintiff must have actually relied on the false advertising or unfair business practice, and as a result, suffered injury therefrom. To have standing in this case, a consumer must have relied on a representation that the license plate frame was "Made in USA" when deciding to buy the frame. Conversely, a consumer who is unaware of, or who did not rely on, a "Made in USA" label did not suffer any injury in fact "as a result of" that alleged unfair business practice or false advertising and would have no standing. (Italics added.) It stands to reason that where there was no actual country of origin representation of any kind, there was nothing upon which a consumer could rely.
As it happens, the CLRA employs the same "as a result of language. "To have standing to assert a claim under the CLRA, a plaintiff must have `suffer[ed] any damage as a result of the ... practice declared to be unlawful.'" (Aron v. Haul Co. of California, supra, 143 Cal. App.4th at pp. 802-803, 49 Cal.Rptr.3d 555, citing Civ.Code, § 1780, subd. (a), italics added.) This similar language use in the CLRA only bolsters our conclusion that causation in the form of reliance is an element of standing under Proposition 64 in an action alleging misrepresentation in violation of the UCL or the FAL.
O'Brien cites Anunziato v. eMachines, Inc. (C.D.Cal.2005) 402 F.Supp.2d 1133, which held "reading reliance into the UCL and the FAL would subvert the public protection aspects of those statutes." (Id. at p. 1137.) Anunziato reasoned, "If actual reliance were required, a consumer who did not read the label and rely on the count and weight representations would be barred from proceeding under the UCL or the FAL because he or she could not claim reliance on the representation in making his or her purchase. Yet[,] the consumer would be harmed as a result of the falsity of the representation." (Ibid.) We are unpersuaded by Anunziato, which represents one side of a split opinion in the federal courts. (See Cattie v. Wal-Mart Stores, Inc. (2007) 504 F.Supp.2d 939, 947.) Also, "decisions of the federal courts interpreting California law are ... not binding." (Mesler v. Bragg Management Co. (1985) 39 Cal.3d 290, 299, 216 Cal.Rptr. 443, 702 P.2d 601.) While we recognize the concerns expressed in Anunziato, we cannot ignore Proposition 64's stated requirement that a plaintiff must suffer "injury in fact ... as a result of" the unfair business practice or false advertising. We are bound to take the statute as enacted and may not give it meaning to conform to a presumed intent that is not expressed. (Knight v. Superior Court (2005) 128 Cal. App.4th 14, 23, 26 Cal.Rptr.3d 687; Code Civ. Proc, § 1858.)
Instead, the interpretation of Proposition 64 in Laster v. T-Mobile USA Inc., supra, 407 F.Supp.2d 1181 is more apt. There, the plaintiffs alleged that the defendants engaged in unfair and deceptive practices by charging consumers sales tax on the full retail value of cellular telephones, which telephones they had advertised as "free" or substantially discounted. (Id. at p. 1183.) The district court held "[b]ecause Plaintiffs fail to allege they actually relied on false or misleading advertisements, they fail to adequately allege causation as required by Proposition 64." *922 (Id. at p. 1194.) The court explained that plaintiffs did "not include any allegations in their FAC that they relied on Defendants' advertisements in entering into the transactions. While Plaintiffs meticulously describe the allegedly misleading advertisements (as later described in Plaintiffs' pleadings, a `bait-and-switch' leading to a `fleece'), none of the named Plaintiffs allege that they saw, read, or in any way relied on the advertisements; nor do they allege that they entered into the transaction as a result of those advertisements." (Ibid.)
We agree with Laster. Proposition 64's requirement that a plaintiff suffer "injury in fact ... as a result of" unfair business practices or false advertising (§§ 17204 & 17535, italics added) necessarily means that O'Brien must have purchased the license plate frame in reliance on a false or misleading representation or advertisement that the frame was "Made in USA" and suffered injury as a consequence. To hold otherwise, we would have to ignore the "as a result of language, reading it out of the initiative all together. That would render the phrase a nullity in contravention of well-established principles of statutory interpretation that "`"an interpretation that renders statutory language a nullity is obviously to be avoided...."' [Citations.]" (Association for Los Angeles Deputy Sheriffs v. County of Los Angeles (2007) 154 Cal.App.4th 1536, 1544, 65 Cal. Rptr.3d 665.)

b. On the undisputed facts, O'Brien has no standing under either the UCL or the FAL.

Applying Proposition 64's standing requirements to this case, it is apparent that O'Brien lacks standing as a private person to prosecute this case under both the UCL and the FAL. O'Brien alleged in his complaint that defendants "fraudulently induced" him "to purchase the License Plate Frames at premium prices," misrepresenting that the license plate frame was "Made in USA" and "Fabrique aux Etats-Unis" when it was not because the frame and its parts were entirely or substantially made or produced outside of the United States of foreign materials. However, O'Brien incontrovertibly did not see any "Made in USA" representation about the license plate frame, either in the catalogue or on the website before he purchased it; the first time he saw any representation of origin was weeks later when the frame arrived in the mail. O'Brien also testified he did no research beyond reviewing the catalogue and website. Indeed, as O'Brien admits, the catalogue made no representation whatsoever about a country of origin anywhere on the page where the license plate frame was depicted. Therefore, the record shows indisputably that O'Brien did not see and did not rely on any representation about the country of origin, and did not purchase the Audi license plate frame as a result of any "Made in USA" representation made by defendants. That is, even if O'Brien has lost money or property, it was not as a result of any violation of the UCL or the FAL.
O'Brien argues that the catalogue misrepresented the license plate frame's origin. To the contrary, the undisputed evidence shows that nowhere on the entire page of the catalogue where the license plate frames are pictured do the words "imported" or "Made in USA" appear. Section 17533.7 makes it unlawful for anyone to offer for sale in California "any merchandise on which merchandise or on its container there appears the words `Made in U.S.A.,' `Made in America,' *923 `U.S.A.,' or similar words when the merchandise or any article, unit, or part thereof, has been entirely or substantially made, manufactured, or produced outside of the United States." (See Benson v. Kwikset Corp. (2007) 152 Cal.App.4th 1254, 1268, 62 Cal.Rptr.3d 284, italics added ["Section 17533.7 constitutes a legislative determination that representations suggesting merchandise was made in the United States are misleading unless the producer's manufacturing processes satisfy the strictures of the statute." (Italics added.)].) The statute does not make it unlawful to omit a designation entirely, O'Brien's suggestion to the contrary notwithstanding.
O'Brien's contention appears to be that any country-of-origin misrepresentation occurred because he assumed one was made. He made this assumption because there were scattered references to "imported" elsewhere in the catalogue but none on the page depicting the frames. He contends that he has standing because he relied on "the implicit representation in the catalogue that the license plate frame at issue was not `imported' and, thus [was] 'Made in USA'"
The standard applied in UCL and false advertising cases is that of the ordinary consumer acting reasonably under the circumstances. (Colgan v. Leatherman Tool Group, Inc. (2006) 135 Cal.App.4th 663, 682, 38 Cal.Rptr.3d 36; Lavie v. Procter & Gamble Co. (2003) 105 Cal.App.4th 496, 504, 129 Cal.Rptr.2d 486.) We conclude on the undisputed facts here that O'Brien's assumption is not reasonable.
It does not necessarily follow from the lack of an "imported" designation that a product was made in the United States. First, California law does not require an advertiser to identify the country of origin in a catalogue or website. The FAL makes it unlawful to use the words "Made in USA" or similar words when that is not the case under the statute. (§ 17533.7.) Second, in California, a product is only deemed "Made in USA" if it contains no "article, unit, or part" that "has been entirely or substantially made, manufactured, or produced outside of the United States." (Ibid.) Thus, as Volkswagen observes, "imported" may not be the same as not "Made in USA." Merely because these frames were not imported, did not ipso facto mean they were "Made in USA" as defined by section 17533.7. Finally, the only references to "imported" items in the catalogue submitted in connection with the motions for summary judgment, are connected to clothing. No country of origin designation is made with respect to any non-clothing item in the entire catalogue. "`Likely to deceive' implies more than a mere possibility that the advertisement might conceivably be misunderstood by some few consumers viewing it in an unreasonable manner." (Lavie v. Procter & Gamble Co., supra, 105 Cal.App.4th at p. 508, 129 Cal.Rptr.2d 486.) For the foregoing reasons, O'Brien's assumption is simply unjustified that where the word "imported" was not associated with the license plate frames, or with the vast majority of items in the catalogue for that matter, the frames necessarily must have been "Made in USA" as defined by the statute. Under the circumstances here, as a matter of law, no reasonable consumer would interpret the absence of a country-of-origin label to mean that the license plate frames were necessarily made in the United States. (See Haskell v. Time, Inc. (E.D.Cal.1994) 857 F.Supp. 1392, 1399 [dismissing UCL and FAL claims].)
As a fallback position, O'Brien relies on the "Made in USA" designation stamped *924 on the packaging containing the license plate frame when he received it in the mail. Section 17533.7 also makes it unlawful to place a country of origin misrepresentation on an item's container. O'Brien argues that "[o]nce [he] received the item, the misrepresentation inducing the sale was confirmed by the clear and explicit packaging containing the express representation the license plate frame was `Made in USA.'" (Italics added.) In our view, this contention is tantamount to an admission that no "Made in USA" representation induced him to purchase the frame. Any misrepresentations about the origin of the license plate frame made after he purchased the item could not logically have induced him to purchase the frame in the first place.
We are also unpersuaded by O'Brien's contention that once he saw the "Made in USA" stamp on the packaging materials, he did not return the license plate frame and suffered damage thereby. He appears to argue that his purchase of the license plate frame was not complete until he decided not to return it, arguing that his purchase included his right to return the item and once he received it, his belief that it was made domestically was confirmed by the packaging. Such a contention does not square with the undisputed facts, as O'Brien testified in his deposition, that he did not return the frame and seek a refund because "at this point I had agreed to be a plaintiff in the case. ..." (Italics added.) He was induced not to return the frame by his agreement to be a plaintiff, not by the "Made in USA" stamp. In any event, we are mindful that the issues to be addressed in a summary, judgment motion are framed by the pleadings. (Wattenbarger v. Cincinnati Reds, Inc. (1994) 28 Cal.App.4th 746, 750, 33 Cal. Rptr.2d 732.) O'Brien's complaint alleges fraudulent inducement to purchase, not fraudulent inducement not to return the license plate frame. The undisputed facts here show that O'Brien was not induced to purchase frames by any representation made at the time of purchase.
Stated otherwise, even assuming O'Brien suffered injury in fact and lost money or property, there is no factual dispute that the injury was not "as a result of" any misrepresentation about where the license plate frame he purchased was manufactured. (§§ 17204, 17203, & 17535.)[10] As a matter of law, therefore, O'Brien did not have standing to bring the first and third causes of action based on the UCL and the FAL. The trial court properly granted summary adjudication of those causes of action.

3. The CLRA

a. The trial court properly granted summary judgment of the CRLA cause of action because O'Brien does not have standing.
The CLRA "targets a class of `unfair methods of competition and unfair or deceptive acts or practices' enumerated in Civil Code section 1770. [Citation.] `Any consumer who suffers any damage as a *925 result of the use or employment by any person of this unlawful conduct may bring an action for damages, restitution of property, and injunctive relief. [Citation.]" (Buckland v. Threshold Enterprises, Ltd., supra, 155 Cal.App.4th at p. 809, 66 Cal. Rptr.3d 543.)
As noted, "To have standing to assert a claim under the CLRA, a plaintiff must have `suffer[ed] any damage as a result of the ... practice declared to be unlawful.'" (Aron v. U-Haul Co. of California, supra, 143 Cal.App.4th at p. 802, 49 Cal.Rptr.3d 555, citing Civ.Code, § 1780, subd. (a).)
For the same reasons O'Brien cannot demonstrate standing under the FAL and the UCL, he cannot demonstrate he suffered damage as the result of any violations of the CLRA. Indeed, O'Brien appears to concede this point. He states: "Plaintiff must show that Defendants' deceptive advertising caused him to purchase the license plate frame. ..." (Italics added.) As demonstrated above, he cannot make that showing. The trial court properly granted summary judgment of O'Brien's CLRA cause of action.

b. The trial court properly granted defendants' motions to strike.

Before damages may be sought under the CLRA the plaintiff must satisfy the CLRA'S pre-filing notice requirement. The CLRA requires at least 30 days before filing a complaint for its violation, that the consumer send written notice, by certified or registered mail, return receipt requested, to the person alleged to have violated the CLRA indicating the particular violation alleged and demanding correction or rectification of the violations. (Civ. Code, § 1782, subd. (a).)[11]
The notice requirement is strict and literal. "The purpose of the notice requirement of [Civil Code] section 1782 is to give the manufacturer or vendor sufficient notice of alleged defects to permit appropriate corrections or replacements. The notice requirement commences the running of certain time constraints upon the manufacturer or vendor within which to comply with the corrective provisions. The clear intent of the act is to ... establish a limited period during which such settlement may be accomplished. This clear purpose may only be accomplished by a literal application of the notice provisions." (Outboard Marine Corp. v. Superior Court (1975) 52 Cal. App.3d 30, 40-41, 124 Cal.Rptr. 852, fn. omitted.)
Defendants moved to strike those portions of O'Brien's complaint that sought damages under the CLRA because O'Brien failed to give the required 30-days' notice before commencing his action. O'Brien's notice was sent on January 21, 2005. His complaint under the CLRA was filed on February 8, 2005, a mere 18 days later. The trial court did not abuse its *926 discretion in granting defendants' motions to strike O'Brien's damages request.

4. The trial court did not abuse its discretion in entering judgment in this case, even though it had the effect of precluding plaintiffs from amending the complaint to name a plaintiff with standing.

a. Factual background

Plaintiffs contend that they had a right to file a motion to amend the complaint to name a new plaintiff and so the trial court abused its discretion in denying the request to "file a motion to amend to add a suitable representative plaintiff with standing."
Proposition 64 was enacted in November 2004, and became effective immediately. (Californians For Disability Rights v. Mervyn's, LLC, supra, 39 Cal.4th at p. 227, 46 Cal.Rptr.3d 57, 138 P.3d 207.) O'Brien filed this action three months later in February 2005. His standing was at issue from nearly the beginning of the case. Defendants first challenged O'Brien's standing in its demurrer filed in March 2005. In April 2005, the trial court ruled that defendants could challenge standing either by demurrer or by summary judgment motion. Discovery was specifically focused on the standing issue only. Defendants' motions for summary judgment challenging standing were brought in August 2005. The trial court heard argument on the motions in May 2006 and took the matter under submission.
The trial court granted the summary judgment motions ruling O'Brien did not have standing on August 8, 2006. In mid-September 2006, five weeks later, defendants filed their proposed judgment. On September 19, 2006, more than a month after the court granted the summary judgment motions, and 19 months after O'Brien filed his complaint, plaintiffs scheduled a status conference for the purpose of "discuss[ing] a timetable for amendment of the complaint...." (Italics added.) Plaintiffs also filed a written objection to the proposed judgment "on the grounds that Plaintiff has a right to amend the complaint and respectfully requests that the Court not sign the proposed judgment to allow for such an amendment."
At the status conference on October 13, 2006, the court stated, "I don't have a motion for leave to amend here or a proposed amended pleading or a proposed plaintiff to be substituted in, and you don't just leave a case open ended forever. So if counsel finds a new plaintiff to pursue a claim of this sort, counsel can file a new action...." The court repeated that nothing was pending before it and so, where it had already ruled on the summary judgment motions, it would enter judgment. With that, the court signed the proposed judgment.

b. Law and application

"[C]ourts have permitted plaintiffs who have been determined to lack standing, or who have lost standing after the complaint was filed, to substitute as plaintiffs the true real parties in interest. [Citations.]" (Branick v. Downey Savings & Loan Assn. (2006) 39 Cal.4th 235, 243, 46 Cal. Rptr.3d 66,138 P.3d 214.)[12]
"`"[T]he trial court has wide discretion in allowing the amendment of *927 any pleading [citations], [and] as a matter of policy the ruling of the trial court in such matters will be upheld unless a manifest or gross abuse of discretion is shown. [Citations.]"' [Citation.] Nevertheless, it is also true that courts generally should permit amendment to the complaint at any stage of the proceedings, up to and including trial. [Citations.] But this policy applies `"only `[w]here no prejudice is shown to the adverse party.'"' [Citation.]" (Melican v. Regents of University of California (2007) 151 Cal.App.4th 168, 175, 59 Cal.Rptr.3d 672.)
That stated, "`"`even if a good amendment is proposed in proper form, unwarranted delay in presenting it may of itselfbe a valid reason for denial.'"' [Citations.] Thus, appellate courts are less likely to find an abuse of discretion in denying leave where, for example, the proposed amendment is `"offered after long unexplained delay ... or where there is a lack of diligence...."' [Citation.]" (Melican v. Regents of University of California, supra, 151 Cal.App.4th at p. 175, 59 Cal. Rptr.3d 672.)
Additionally, to establish that the trial court abused its discretion in denying leave to amend, the plaintiff must show that the complaint can be amended to cure the defects. (Smith v. State Farm Mutual Automobile Ins. Co. (2001) 93 Cal. App.4th 700, 711, 113 Cal.Rptr.2d 399.) The "`showing that the complaint can be amended to state a cause of action "need not be made in the trial court so long as it is made to the reviewing court."'" (Velez v. Smith (2006) 142 Cal.App.4th 1154, 1175, 48 Cal.Rptr.3d 642.)
For example, in Levy v. Skywalker Sound (2003) 108 Cal.App.4th 753, 134 Cal. Rptr.2d 138, the trial court did not abuse its discretion in denying leave to amend the complaint where the plaintiff had waited several months after the dispositive discovery to seek leave to amend, did not file a procedurally proper motion for leave to amend, and did not request a continuance of the hearing on the summary judgment motion in order to pursue the matter. Also, the amendment would not have changed the result. (Id. at pp. 770-771, 134 Cal.Rptr.2d 138.)
In Huff v. Wilkins (2006) 138 Cal. App.4th 732, 41 Cal.Rptr.3d 754, the trial court was held not to have abused its discretion in denying leave to amend the complaint where the plaintiff moved for leave to add a new claim three days before the scheduled hearing on the defendant's summary judgment motion. The plaintiff had given no explanation for his delay in seeking to amend. Also, the court recognized that no liability would lie under the new claim. (Id. at p. 746, 41 Cal.Rptr.3d 754.)
Here, plaintiffs have produced no explanation for their extensive delay before mentioning amendment. Despite the fact the question of O'Brien's standing to bring the action was at the forefront of this litigation for the first 15 months of this case, plaintiffs never filed a motion seeking leave to amend the complaint and never attempted to name a plaintiff who would comply with the standing requirements after the trial court issued its 15-page statement of decision explaining why O'Brien did not have standing. Indeed, the first time plaintiffs asserted their right *928 to amendment was five weeks after the trial court granted summary judgment when defendants filed the proposed judgment. For 40 days after the trial court granted summary judgment and issued its statement of decision, during which time plaintiffs were well aware of the court's view, plaintiffs made no attempt to file a motion seeking leave to amend the complaint. Only after defendants lodged a proposed judgment did plaintiffs even raise the subject of filing a motion for leave to amend. Then, rather than to file a proposed complaint, plaintiffs sought merely a status conference to "discuss a timetable" for an anticipated motion to amend the complaint. Plaintiffs cannot be allowed to sit back and seek leave to amend for this lengthy amount of time.
Moreover, at no timeeven during this appealhave plaintiffs offered a proposed amendment to cure the defect. Plaintiffs never filed a declaration indicating that they had a person with standing. (Velez v. Smith, supra, 142 Cal.App.4th at p. 1175, 48 Cal.Rptr.3d 642; Smith v. State Farm Mutual Automobile Ins. Co., supra, 93 Cal.App.4th at p. 711, 113 Cal.Rptr.2d 399.) Since the August 8, 2006, ruling, this case has had no named plaintiff.
"`It is ... well established that courts have fundamental inherent equity, supervisory, and administrative powers, as well as inherent power to control litigation before them. [Citation.] ... "... That inherent power entitles trial courts to exercise reasonable control over all proceedings connected with pending litigation ... in order to insure the orderly administration of justice. [Citation.]"' [Citation.]" (Elkins v. Superior Court (2007) 41 Cal.4th 1337, 1351, 63 Cal.Rptr.3d 483, 163 P.3d 160.) Where the trial court had no motion to amend before it, least of all a motion for leave to amend, we cannot say it abused its discretion in entering judgment upon its ruling, which effectively precluded plaintiffs from amending their complaint.[13]

DISPOSITION
The judgment is affirmed. Each party to bear its own costs on appeal.
We concur: KLEIN, P.J., and KITCHING, J.
NOTES
[1] Business and Professions Code section 17200 et seq. All further statutory references are to the Business and Professions Code, unless otherwise noted.
[2] Section 17500 et seq.
[3] Civil Code section 1750 et seq.
[4] O'Brien had no complaints about the quality of the license plate frame. He testified that the frame he received "looked good," "was nice," and "appeared to be new." The license plate frame that he received fit the expectations he had when he placed the order.
[5] We are informed that O'Brien ha? also filed a similar action in federal court.
[6] Section 17533.7 reads in its entirety: "It is unlawful for any person, firm, corporation or association to sell or offer for sale in this State any merchandise on which merchandise or on its container there appears the words `Made in U.S.A.,' `Made in America,' `U.S.A.,' or similar words when the merchandise or any article, unit, or part thereof, has been entirely or substantially made, manufactured, or produced outside of the United States."
[7] Proposition 64 also amended section 17203, which authorizes courts to enjoin unfair competition, by adding the qualifying words: "Any person may pursue representative claims or relief on behalf of others only if the claimant meets the standing requirements of Section 17204 and complies with Section 382 of the Code of Civil Procedure, but these limitations do not apply to claims brought under this chapter by the Attorney General, or any district attorney, county counsel, city attorney, or city prosecutor in this state." (§ 17203, italics added; Californians For Disability Rights v. Mervyn's, LLC, supra, 39 Cal.4th at pp. 228-229, 46 Cal.Rptr.3d 57, 138 P.3d 207.)
[8] Section 17535, as amended by Proposition 64, reads in pertinent part: "Actions for injunction under this section may be prosecuted by ... any person who has suffered injury in fact and has lost money or property as a result of a violation of this chapter. Any person may pursue representative claims or relief on behalf of others only if the claimant meets the standing requirements of this section and complies with Section 382 of the Code of Civil Procedure, but these limitations do not apply to claims brought under this chapter by the Attorney General, or any district attorney, county counsel, city attorney, or city prosecutor in this state." (§ 17535, as amended by Prop. 64, § 5, approved Nov. 2, 2004, eff. Nov. 3, 2004).
[9] Thus, while we agree with O'Brien that "standing and liability ... are separate legal concepts," we are not addressing reliance as an element of a cause of action under the UCL. As we are only interested in the test of standing, we do not address in any manner whether Proposition 64 had any effect on the substantive elements of a cause of action under the UCL, O'Brien's insistence to the contrary notwithstanding.
[10] O'Brien contends that the UCL is a strict liability cause of action with the result he is not required to demonstrate reliance on any alleged misrepresentation. Apart from the fact this argument focuses on the elements of the cause of action and not on the standing prerequisite, the contention overlooks the impact of Proposition 64 which was designed to address this issue. Moreover, at least one court has concluded that "actual reliance is an element of a CLRA claim sounding in fraud." (Buckland v. Threshold Enterprises, Ltd. (2007) 155 Cal.App.4th 798, 811, 66 Cal. Rptr.3d 543.)
[11] Civil Code section 1782, subdivision (a) states: "Thirty days or more prior to the commencement of an action for damages pursuant to this title, the consumer shall do the following: [¶] (1) Notify the person alleged to have employed or committed methods, acts, or practices declared unlawful by Section 1770 of the particular alleged violations of Section 1770. [¶] (2) Demand that the person correct, repair, replace, or otherwise rectify the goods or services alleged to be in violation of Section 1770. [¶] The notice shall be in writing and shall be sent by certified or registered mail, return receipt requested, to the place where the transaction occurred or to the person's principal place of business within California."
[12] In Branick v. Downey Savings & Loan Assn., supra, 39 Cal.4th 235, 46 Cal.Rptr.3d 66, 138 P.3d 214, the plaintiff lost standing because the case was pending when Proposition 64 was approved by the voters. (Id. at p. 242.) Branick, of course, does not aid plaintiffs here because plaintiffs filed their complaint three months after Proposition 64 became effective and so plaintiffs were always aware that standing would be an issue.
[13] Stalnaker v. Boeing Co. (1986) 186 Cal. App.3d 1291, 231 Cal.Rptr. 323, does not aid plaintiffs. Stalnaker stated that the plaintiffs there "could clearly have moved the court for leave to amend and to defer ruling on the summary judgment motion until the amendment had been granted. [Citations.]" (Id. at p. 1302, 231 Cal.Rptr. 323.) Here, plaintiffs did not file a motion for leave to amend either before the trial court ruled on the summary judgment motions, or anytime thereafter; they sought only to discuss the matter.